**FILED**

2-13-2013

FEB 1 3 2013

THOMAS G BRUTON
CLERK, U.S. DISTRICT COURT

AO 91 (REV.5/85) Criminal Complaint

AUSA Erika Csicsila (312) 353-5370
AUSA Sarah Streicker (312) 353-1415

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

1 - JOSE ARGUIJO,
2 - ANTONIO VALENCIA-PANTOJA,
3 - ANTHONY MADISON,
4 - PAUL JENKINS,
5 - LAKICHA WHITE,
6 - DILSON ROCHA,
7 - JOEL MELENDEZ, and
8 - DWAYNE PAYNE, aka "Murder."

**CRIMINAL COMPLAINT**

CASE NUMBER **13CR0155**

**UNDER SEAL**

MAGISTRATE JUDGE MARTIN

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief:

**Count One**

On or about August 28, 2012, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, DWAYNE PAYNE, aka "Murder," defendant herein:

did knowingly and intentionally possess with intent to distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance;

in violation of Title 21, United States Code, Section 841(a)(1).

**Count Two**

On or about September 3, 2012, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, JOSE ARGUIJO, defendant herein:

did knowingly and intentionally distribute a controlled substance, namely, 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance;

in violation of Title 21, United States Code, Section 841(a)(1).

### Count Three

On or about September 3, 2012, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, PAUL JENKINS and LAKICHA WHITE, defendants herein:

> did knowingly and intentionally possess with intent to distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance;

in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

### Count Four

On or about September 3, 2012, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, DILSON ROCHA, defendant herein:

> did knowingly and intentionally possess with intent to distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance;

in violation of Title 21, United States Code, Section 841(a)(1).

### Count Five

On or about September 4, 2012, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, ANTHONY MADISON, defendant herein:

> did knowingly and intentionally possess with intent to distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance;

in violation of Title 21, United States Code, Section 841(a)(1).

### Count Six

On or about September 19, 2012, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, JOEL MELENDEZ, defendant herein:

> did knowingly and intentionally possess with intent to distribute a controlled substance, namely, 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance;

in violation of Title 21, United States Code, Section 841(a)(1).

### Count Seven

On or about November 30, 2012, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, ANTONIO VALENCIA-PANTOJA, defendant herein:

did conspire with Lucio Cuevas, and with others known and unknown, to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1);

in violation of Title 21, United States Code, Section 846.

I further state that I am a Special Agent with the Drug Enforcement Administration, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
ROBERT LUKENS
Special Agent, Drug Enforcement Administration

Sworn to before me and subscribed in my presence,

February 13, 2012        at     Chicago, Illinois
Date                               City and State

Daniel G Martin, U.S. Magistrate Judge
Name & Title of Judicial Officer             Signature of Judicial Officer

UNITED STATES DISTRICT COURT    )
                         )    ss
NORTHERN DISTRICT OF ILLINOIS    )

## AFFIDAVIT

I, ROBERT LUKENS, being duly sworn, state as follows:

1.    I am a Special Agent with the Drug Enforcement Administration ("DEA"), and have been so employed for approximately ten years. My current responsibilities include the investigation of narcotics trafficking offenses.

2.    The information contained in this Affidavit is based on my participation in this investigation; my conversations with and review of reports prepared by law enforcement officers, including the Chicago Police Department ("CPD") and DEA; the results of physical surveillance; agents' review of conversations intercepted pursuant to Court orders authorizing the interception of wire communications; my training and experience; and the training and experience of other law enforcement officers I have consulted. Since this Affidavit is being submitted for the limited purpose of establishing probable cause as set forth herein, I have not included each and every fact known to me concerning this investigation.

## I.    PURPOSE OF THIS AFFIDAVIT

3.    This affidavit is made for the purpose of establishing probable cause in support of the issuance of arrest warrants against the proposed defendants, as well as for the purpose of establishing probable cause in support of a criminal complaint charging that:

1

a.    JOSE ARGUIJO did knowingly and intentionally distribute a controlled substance, namely 5 kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) (*see* paragraphs 19-49);

b.    ANTONIO VALENCIA-PANTOJA, did conspire with Lucio Cuevas, and with others known and unknown, to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), in violation of Title 21, United States Code, Section 846 (*see* paragraphs 87-101);

c.    ANTHONY MADISON did knowingly and intentionally possess with the intent to distribute a controlled substance, namely 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) (*see* paragraphs 24-32 and 56-64);

d.    PAUL JENKINS and LAKICHA WHITE did knowingly and intentionally possess with the intent to distribute a controlled substance, namely 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) and 2 (*see* paragraphs 19-55);

e.    DILSON ROCHA did knowingly and intentionally possess with the intent to distribute a controlled substance, namely 500 grams or more of a mixture and

2

substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) and 2 (*see* paragraphs 24-49);

      f.    JOEL MELENDEZ did knowingly and intentionally possess with the intent to distribute a controlled substance, namely 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) (*see* paragraphs 65-75); and

      g.    DWAYNE PAYNE did knowingly and intentionally possess with the intent to distribute a controlled substance, a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) (*see* paragraphs 10-18).

    4.    This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, my experience and training, and my review of investigative reports and other documents.

## II.    BACKGROUND

    5.    Beginning no later than June 2012, DEA and the Chicago Police Department ("CPD") have been conducting an investigation into the distribution of illegal narcotics in and around the Chicago area by various individuals, including Johnny Chaparro ("Chaparro") and Johnny Mendez ("Mendez"). As part of the investigation, and in part through court-authorized wire interceptions, physical surveillance, and covert seizures of illegal narcotics, law enforcement has identified

3

Chaparro and Mendez as wholesale distributors of illegal narcotics, including kilogram quantities of cocaine and heroin, who work together to further their narcotics trafficking activities. In addition, law enforcement has determined that Chaparro and Mendez obtained wholesale quantities of cocaine and heroin from multiple sources of supply, including JOSE ARGUIJO ("ARGUIJO") and ANTONIO VALENCIA-PANTOJA ("VALENCIA-PANTOJA"). Law enforcement has also determined that Chaparro and Mendez have multiple illegal narcotics customers, including ANTHONY MADISON ("MADISON"), PAUL JENKINS ("JENKINS"), LAKICHA WHITE ("WHITE"), DILSON ROCHA ("ROCHA"), JOEL MELENDEZ ("MELENDEZ"), and DWAYNE PAYNE, aka "Murder" ("PAYNE").

6.     On December 13, 2012, Chaparro and Mendez were charged by criminal complaint in Case Number 12 CR 969 (Magistrate Judge Cole) with conspiracy to possess with intent to distribute and to distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846 (Count One). In that same complaint, Lucio Cuevas was also charged with possessing with the intent to distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) (Count Two).

7.     In the process of this investigation, the government sought and the Court granted authority to intercept the following wire and electronic communications:

4

a. On August 9, 2012, Chief Judge James F. Holderman entered an Order (the "August 9, 2012 Order") authorizing the interception, for a 30-day period, of wire communications to and from Target Phone 3, used by Chaparro. Pursuant to the August 9, 2012 Order, law enforcement interception of Target Phone 3 began on August 9, 2012 and continued until September 6, 2012.

b. On September 6, 2012, Chief Judge James F. Holderman entered an Order (the "September 6, 2012 Order") authorizing the interception, for a 30-day period, of wire communications to and from Target Phone 3, used by Chaparro. Pursuant to the September 6, 2012 Order, law enforcement interception of Target Phone 3 began on September 7, 2012 and continued until October 5, 2012.

c. On September 10, 2012, Chief Judge James F. Holderman entered an Order (the "September 10, 2012 Order") authorizing the interception, for a 30-day period, of wire communications to and from Target Phone 4, used by Mendez. Pursuant to the September 10, 2012 Order, law enforcement interception of Target Phone 4 began on September 11, 2012 and continued until October 4, 2012.

d. On September 17, 2012, Chief Judge James F. Holderman entered an Order (the "September 17, 2012 Order") authorizing the interception, for a 30-day period, of wire communications to and from Target Phone 5, used by Mendez. Pursuant to the September 17, 2012 Order, law enforcement interception of Target Phone 5 began on September 17, 2012 and ended on October 4, 2012.

e. On September 19, 2012, Chief Judge James F. Holderman entered an Order (the "September 19, 2012 Order") authorizing the interception, for a 30-day

5

period, of wire communications to and from Target Phone 6, used by Chaparro. Pursuant to the September 19, 2012 Order, law enforcement interception of Target Phone 6 began on September 19, 2012 and continued until October 9, 2012.

f.      On October 12, 2012, Chief Judge James F. Holderman entered an Order (the "October 12, 2012 Order") authorizing the interception, for a 30-day period, of wire communications to and from Target Phone 7, used by Mendez, and Target Phone 8, used by PAYNE. Pursuant to the October 12, 2012 Order, law enforcement interception of Target Phone 7 and Target Phone 8 began on October 12, 2012 and continued until November 1, 2012.

g.      On November 9, 2012, Chief Judge James F. Holderman entered an order (the "November 9, 2012 Order" authorizing the interception, for a 30-day period, of wire communications to and from Target Phone 7, used by Mendez. Pursuant to the November 9, 2012 Order, law enforcement interception of Target Phone 7 began on November 12, 2012 and continued until December 4, 2012.

h.      On November 14, 2012, Chief Judge James F. Holderman entered an Order (the "November 14, 2012 Order") authorizing the interception, for a 30-day period, of wire communications to and from Target Phone 11, used by PAYNE. Pursuant to the November 14, 2012 Order, law enforcement interception of Target Phone 11 began on November 14, 2012, and continued until December 13, 2012.

i.      On November 21, 2012, Chief Judge James F. Holderman entered an Order (the "November 21, 2012 Order") authorizing the interception, for a 30-day period, of wire communications to and from Target Phone 12, used by Chaparro.

6

Pursuant to the November 21, 2012 Order, law enforcement interception of Target Phone 12 began on November 21, 2012, and continued until December 3, 2012.

## III.   PROBABLE CAUSE SUPPORTING COMPLAINT

8.     Based upon the investigation and the court-authorized interceptions listed below, I believe that Chaparro and Mendez were working together to distribute kilogram quantities of narcotics in the Chicago area. As discussed below, between no later than August 2012 and November 2012, Chaparro and Mendez obtained, or attempted to obtain, kilogram quantities of illegal narcotics from multiple narcotics sources of supply, including from ARGUIJO on or about September 3, 2012 and November 26, 2012, and from VALENCIA-PANTOJA on or about November 30, 2012.

9.     In addition, during the same time period, Chaparro and Mendez distributed wholesale quantities of narcotics to multiple customers, including (1) approximately 75 grams of heroin to PAYNE on or about August 28, 2012; (2) approximately three kilograms of cocaine to JENKINS and WHITE on or about September 3, 2012; (3) approximately one kilogram of cocaine to ROCHA on or about September 3, 2012; (4) approximately three kilograms of cocaine to MADISON on September 4, 2012; and (5) approximately 225 grams of heroin to MELENDEZ on or about September 19, 2012. Also, on or about November 26, 2012, PAYNE conspired with Individual C to illegally possess two firearms.

7

**B.** **On August 28, 2012, Chaparro, Mendez, and Individual A Distributed Approximately 75 Grams of Heroin to PAYNE.**

10.     On or about August 28, 2012, at approximately 5:02 p.m. (Call #997), Chaparro, who was using Target Phone 3,[1] had a telephone conversation with Mendez, who was using Target Phone 5.[2] During the conversation, Mendez asked Chaparro whether PAYNE could obtain 75 grams of heroin from Chaparro. Specifically, Mendez stated, "I'm over here in Wisconsin Dells and I don't have no signals [Mendez was in Wisconsin and did not have a phone signal]." Later in the conversation, Mendez asked, "Can Murder [PAYNE][3] come check you out [obtain narcotics from Chaparro]?" Chaparro responded, "Yeah." Mendez stated, "Alright, I'm gonna call him [PAYNE], you know I need him to go do something for me [Mendez needed PAYNE to distribute

---

[1]     Chaparro has been identified as the user of Target Phone 3 based in part on the following information: On or about June 28, 2012, the Court signed an Order authorizing the use of pen register and digital analyzer technology to determine the telephone numbers used by Chaparro. On or about July 27, 2012, pursuant to the Court's Order, law enforcement officers familiar with Chaparro's appearance, having previously viewed photographs of him and observed him during prior surveillance, used a digital analyzer device on three occasions in three different locations where Chaparro was observed to determine the IMSI associated with any cellular telephone being carried by Chaparro. Using the digital analyzer device, in conjunction with surveillance of Chaparro, law enforcement determined that the telephone number bearing IMSI 316010151032079 was in the same vicinity in the three separate locations where Chaparro was observed. Phone records from Sprint/Nextel for the telephone number bearing IMSI number 316010151032079 reflects that the telephone number associated with this telephone is 773-302-1755 – Target Phone 3.

[2]     Law enforcement was not intercepting wire communications over Target Phone 5 on August 28, 2012. *See* paragraph 7(d).

[3]     Law enforcement has identified "Murder" as being PAYNE's nickname based in part upon subsequent intercepted telephone calls, which indicate that PAYNE, in fact, later picked up heroin from Chaparro's associate, Individual A (*see* paragraphs 14-18), as well as an intercepted conversation between Chaparro and PAYNE, during which PAYNE responded after Chaparro asked, "Oh, this is uh, Murder?" *See* paragraph 12.

narcotics for him]. So I'm gonna have him [PAYNE] call you." Chaparro asked, "Do

something for you ?" Mendez stated, "Yeah, he's gonna see somebody for me [PAYNE

was going to deliver narcotics to someone on Mendez's behalf]." Chaparro responded,

"Okay . . . . Then he [PAYNE] is going to bring me the tickets [the narcotics proceeds]

back?" Mendez replied, "No, no he's not getting the tickets, I'm getting the tickets

when I come back [Mendez would obtain the narcotics proceeds when he returned]."

Chaparro subsequently asked, "What you trying to do [what quantity of heroin would

PAYNE be picking up for Mendez's customer]?" Mendez responded, "I'm gonna call,

uh 75 [75 grams of heroin]."[4] Chaparro stated, "Alright." Mendez responded, "Alright,

I'm gonna call him [PAYNE] right now."

11.     According to toll records, on or about August 28, 2012, at approximately

5:17 p.m., 5:19 p.m., 5:47 p.m., and 6:07 p.m., Target Phone 5 was in contact with

telephone number (920)941-0444 ("Payne Phone 1"). Based in part upon the

intercepted telephone conversation above (*see* paragraph 10), law enforcement believes

---

[4]     Based upon my training and experience, I believe that Mendez's reference to
"75" is consistent with the way narcotics traffickers of heroin refer to distribution
quantities of heroin, as opposed to other types of illegal narcotics.

that Mendez used Target Phone 5 to contact PAYNE, who was using Payne Phone 1,[5] to discuss the impending 75 gram heroin transaction.

12.     On or about August 28, 2012, at approximately 6:44 p.m. (Call #1010), Chaparro who was using Target Phone 3, had a telephone conversation with PAYNE, who was using Payne Phone 1. During this conversation, PAYNE told Chaparro that Mendez wanted him to obtain narcotics from Chaparro. Specifically, PAYNE stated, "Shit, T [Mendez] want me to come holler at you [pick up narcotics]." Chaparro responded, "Oh, this is uh, Murder? Uh, where you at?" PAYNE responded, "Shit, I'm on the expressway leaving my crib." Chaparro responded that he was at "Carroll and Kedzie at the mechanic shop." PAYNE then said, "That's where you want me to come see you at [should PAYNE pick up the narcotics from Chaparro at the mechanic shop]?" Chaparro stated, "Well you gotta pick me up. I don't got no car and they ain't done with the brakes yet . . . you got to take me by my car, my car is by Cicero." DWAYNE PAYNE responded, "Alright."

13.     On or about August 28, 2012, at approximately 7:32 p.m. (Call #1015), Chaparro, who was using Target Phone 3, had a telephone conversation with PAYNE,

---

[5]     On or about March 29, 2012, two CPD officers conducted a traffic stop on a vehicle. The driver of the vehicle provided an Illinois identification card, which identified the driver as PAYNE. In addition, during the stop, the CPD officers engaged in a conversation with PAYNE for approximately 10 minutes. Then, on or about August 9, 2012, Chief Judge James Holderman authorized the interception of wire communications over Chaparro's cellular telephone, Target Phone 3. On August 28, 2012, one of the same law enforcement officers who conducted the traffic stop of PAYNE on March 29, 2012 listened to Call #1010 and Call # 1015, both intercepted over Target Phone 3 and both of which involve calls made from telephone number 920-941-0444 (Payne Phone 1). The officer identified the voice of the user of Payne Phone 1 as that of PAYNE.

who was using Payne Phone 1. During the conversation, PAYNE told Chaparro that he had arrived at 3754 N. Oketo, previously determined to be Chaparro's residence (the "Chaparro Residence"),[6] and Chaparro stated that Mendez's mother should be able to let him in and provide him with the heroin. Specifically, Chaparro stated, "Yes sir, I'm on my way." Later, PAYNE said, "Yeah, I'm here [at the Chaparro Residnce]." Later, Chaparro said, "I will be right there." PAYNE then said, "I'm gonna find me a white girl [herion] over here somewhere [PAYNE wanted to obtain heroin from the Chaparro Residence]." Chaparro responded, "Alright, you know what? Um, let me see if you can just go in the house, and put his mother [Mendez's mother, Individual A] on the phone." PAYNE responded, "Oh yeah, she [Individual A] is in there [at the Chaparro Residence]?" Chaparro replied, "Yeah, somebody's there, just uh, so you don't have to be waiting around, just have her [Individual A] call me."

14.     Approximately two minutes later, at approximately 7:34 p.m. (Call #1018), Chaparro, who was using Target Phone 3, had a telephone conversation with Individual A, who was using Individual A Phone 1. During this conversation, Chaparro instructed Individual A to give 75 grams of heroin to PAYNE. Specifically, Chaparro said, "Look, Johnny's friend [Mendez's friend, PAYNE] is right at the door. . . . The little black guy, Johnny's friend [PAYNE]." Individual A responded, "Ok . . . let him in?" Chaparro replied, "Yeah, open the drawer. Look in the drawer on the top

---

[6]     On at least 20 occasions prior to November 30, 2012, surveillance established in the area of the 3754 N. Oketo observed Chaparro exiting or entering the residence. In addition, Chaparro provided the Chaparro Residence as his address when he spoke with law enforcement after being arrested on or about November 30, 2012.

drawer. Open the drawer." Individual A asked, "From where [the drawer in which room]?" Chaparro responded, "In the kitchen . . . You know, the, the big, the big drawer [the heroin was in the kitchen in the big drawer]." Individual A stated, "Okay, I'm in the kitchen, I'm in the kitchen already." Chaparro stated, "Okay, the one . . . to the left . . . the first one, the first one, not the one by the microwave." Individual A stated, "Okay, go ahead." Chaparro responded, "There is one of those [heroin] and one of those to weigh [a scale to weigh narcotics]. Give it to him so he can take some from there [Chaparro directed Individual A to give PAYNE the bag of heroin and the scale]." Individual A stated, "Okay, a package [package of heroin] and the weight [scale] that." Chaparro responded, "Ah uh." Individual A stated, "Okay, bye, bye, he's right here [PAYNE had arrived]." Chaparro stated, "But, make sure he takes seven-five only [Chaparro asked Individual A to make sure that PAYNE took only 75 grams]. . . Tell me what he takes [Chaparro wanted Individual A to tell him the amount of heroin that PAYNE took]."

15.     Approximately one minutes later, at approximately 7:35 p.m. (Call #1019), Chaparro, who was using Target Phone 3, had a telephone conversation with Individual A, who was using Individual A Phone 1.   During this conversation, Chaparro told Individual A where the narcotics packaging material was located. Specifically, Chaparro stated, "The small plastic bag [for packaging narcotics] that is in on." Individual A responded, "I got it.  I got it.  I got you."

16.     Approximately one minute later, at approximately 7:36 p.m. (Call #1020), Chaparro, who was using Target Phone 3, had a telephone conversation with

Individual A, who was using Individual A Phone 1. During this conversation, Individual A confirmed that PAYNE should receive 75 grams of heroin. Specifically, Individual A asked, "What was the number [how much heroin was PAYNE supposed to receive]?" Chaparro responded, "Seven-five [75 grams] . . . Look, whatever he takes, just make sure he tells what [Chaparro wanted PAYNE to tell Individual A the amount of heroin that he took]." Individual A can then be heard talking to another person in the background and stating, "Whatever you [PAYNE] want just take, let him [Chaparro] know." Chaparro stated, "I didn't say all that man, I'm telling you goofy ass [Chaparro did not mean for Individual A to pass along what he said to PAYNE]." Chaparro further stated, "What he take, what he takes that he tells me what it is [PAYNE must tell Chaparro the amount of heroin that he took from Chaparro's residence]." Individual A responded, "Okay, I'm right here [Individual A was with PAYNE as he was measuring out the heroin]."

17.    Based upon the telephone calls described above (*see* paragraphs 10-16), law enforcement conducted surveillance ("surveillance") in the area of the Chaparro Residence. At approximately 7:39 p.m., surveillance officers, having previously viewed a photograph of PAYNE, observed PAYNE exit the Chaparro Residence carrying a white bag and enter a green conversion van that was parked in the area of the Chaparro Residence. Law enforcement then initiated roving surveillance on PAYNE and the green conversion van. Based in part upon intercepted conversations as well as surveillance (*see* paragraphs 10-16, above), law enforcement believes that while

PAYNE was in the Chaparro Residence, PAYNE obtained 75 grams of heroin from Individual A.

18.     On or about August 28, 2012, at approximately 8:23 p.m., surveillance observed PAYNE park the green conversion van in the area of 611 N. Campbell, Chicago, Illinois. Surveillance observed PAYNE exit the van holding the same bag that he had carried out of the Chaparro Residence at approximately 7:39 p.m. Surveillance then observed PAYNE show the bag to several males standing on the street.

**B.      On September 3, 2012, ARGUIJO Distributed 10 Kilograms of Cocaine to Chaparro, and Chaparro Distributed Portions of The 10 Kilograms of Cocaine To JENKINS, WHITE, and ROCHA.**

      1.      On September 2, 2012, Chaparro and ARGUIJO Discussed The Impending 10 Kilogram Cocaine Transaction, and Chaparro and JENKINS Discussed Chaparro's Impending Subsequent 3 Kilogram Cocaine Distribution to JENKINS.

19.     On or about September 2, 2012, at approximately 3:51 p.m. (Call #1338), Chaparro, who was using Target Phone 3, had a telephone conversation with ARGUIJO, who was using a telephone with IMSI number 31601051003978 ("Arguijo Phone 1").[7] During the conversation, Chaparro told ARGUIJO that he was looking for

---

[7]      ARGUIJO was identified as the user of Arguijo Phone 1 and telephone number (773)703-0518 ("Arguijo Phone 2") based in part upon the following information: On or about September 3, 2012, at approximately 1:34 p.m. (Call #1422), Chaparro, who was using Target Phone 3, had a telephone conversation with a then-unknown male, who was using Arguijo Phone 1. During the conversation, the unknown male told Chaparro that he had arrived at the Chaparro Residence (*see* paragraph 37). At the same time, surveillance established in the area of the Chaparro Residence observed the unknown male talking on the telephone. Then, on or about November 26, 2012, at approximately 2:21 p.m. and 3:52 p.m., law enforcement intercepted telephone conversations between Chaparro, who was using Target Phone 12, and a then-unknown male, who was using telephone

narcotics. Specifically, Chaparro said, "Suffering [Chaparro was in need of narcotics]." ARGUIJO then said, "Okay, what was I going to tell you? A little bit later I am going to be around over there to see if we can talk [ARGUIJO would determine whether kilograms of cocaine were available to sell to Chaparro]."

20.    On or about September 2, 2012, at approximately 6:52 p.m. (Call #1354), Chaparro, who was using Target Phone 3, had a telephone conversation with JENKINS, who was using telephone number 773-329-9465 ("Jenkins Phone 1").[8] During the conversation, JENKINS ordered three kilograms of cocaine from Chaparro at a price of $37,000 per kilogram. Specifically, JENKINS asked, "How much they [Chaparro's narcotics source] want for it [a kilogram of cocaine]?" Chaparro responded, "Thirty-seven [$37,000]."[9] They want, they want thirty-six, I told them to

―――――――――――――――――

number (773)703-0518 (*see* paragraphs 77-78). During those conversations, Chaparro and ARGUIJO discussed an impending narcotics transaction. A few minutes after the telephone call at 3:52 p.m., CPD conducted a traffic stop on a vehicle in the area of the Chaparro Residence being driven by the same unknown male observed on September 3, 2012. In connection with the traffic stop, the unknown male provided a Mexican identification card bearing ARGUIJO's name and his photograph.

[8]    JENKINS has been identified as the user of 773-329-9465 based in part upon the following. On or about September 2, 2012, CPD officers monitoring calls intercepted on Target Phone 3 listened to call numbers 1319, 1333, 1342, and 1343, all of which were between Chaparro, who was using Target Phone 3, and an unidentified male who was using 773-329-9465. Later that same day, law enforcement officers who were familiar with JENKINS' appearance based upon having reviewed a photograph of him conducted surveillance of JENKINS. At approximately 5:22 p.m. on September 2, 2012, a CPD officer placed a call to 773-329-9465 and a male voice answered the phone, which the CPD Officer recognized to be the same male voice speaking over 773-329-9465 in call numbers 1319, 1333, 1342, and 1343. At the time that the CPD Officer placed the call to 773-329-9465, a CPD Officer who was conducting surveillance observed JENKINS answer the telephone.

[9]    Based upon my training and experience, I know $37,000 is consistent with the then-current wholesale price for a kilogram of cocaine.

15

make a dollar I got to do thirty-seven [Chaparro stated that his narcotics source wanted to charge $36,000 per kilogram of cocaine, but Chaparro stated that he had to charge $37,000 in order to make money for himself]." JENKINS replied, "Ah, it will happen . . . [the price increase] ain't gonna stop me from fucking with you [JENKINS stated that he was willing to pay $37,000 to purchase the kilograms from Chaparro]." Chaparro stated, "Well that's what it is if, if you want to do something that's what they talking about." JENKINS responded, "Yeah, yeah grab me three of them [three kilograms of cocaine] man. [T]wo of um is seventy-four [two kilograms would cost $74,000]. Thirty-seven, thirty-seven is seventy-four, another thirty-seven is one, one ten some shit like that [JENKINS stated that 3 kilograms of cocaine at $37,000 per kilogram would cost approximately $110,000] . . . Well just get three of them [three kilograms]. When you gonna bring them, tomorrow?" Chaparro stated, "Well I got to let him [the narcotics source] know right now cause if I don't . . . by tomorrow they [the kilograms of cocaine] gone." JENKINS confirmed, "Yeah well grab me, I'll take three of them man." Chaparro stated, "Alright I was gonna try to grab ten [ten kilograms of cocaine]."

21.     On or about September 2, 2012, at approximately 8:01 p.m. (Call#1361), Chaparro, who was using Target Phone 3, had a telephone conversation with ARGUIJO, who was using Arguijo Phone 1. During the conversation, Chaparro and ARGUIJO discussed whether Chaparro could obtain 10 kilograms of cocaine on credit. Specifically, ARGUIJO told Chaparro, "That by credit . . . can't be done [Chaparro

could not obtain the drugs on credit]." Later, Chaparro said, "Well . . . let's go like you told me [Chaparro would pay for the drugs up front]."

22.     On or about September 2, 2012, at approximately 8:08 p.m. (Call #1364), Chaparro, who was using Target Phone 3, had a telephone conversation with an ARGUIJO, who was Arguijo Phone 1.   During the conversation, Chaparro and ARGUIJO discussed the impending 10 kilogram cocaine transaction.  Specifically, ARGUIJO stated, "Can you, can you with the 10 now [ARGUIJO asked whether Chaparro was ready to take delivery of the 10 kilograms of cocaine]?"  Chaparro responded, "Yes, sir.  Okay then, for what time [what time would the cocaine be delivered]?" ARGUIJO stated, "What time do you want us to call you? I think it's from two o'clock on [delivery would occur around 2 p.m. the following day]."  Chaparro responded, "It can't be early like always."  Later in the conversation, Chaparro asked ARGUIJO if the delivery was "for sure," and ARGUIJO responded, "Yes, this guy already told me [the narcotics source confirmed the delivery]."  Chaparro responded, "Okay, I'll be ready, you call me [Chaparro would be ready to take delivery of the cocaine]."

23.     On or about September 2, 2012 at approximately 8:48 p.m. (Call #1367), Chaparro, who was using Target Phone 3, had a telephone conversation with JENKINS, who was using Jenkins Phone 1. Chaparro and JENKINS agreed to meet the next day to conduct the three kilogram of cocaine transaction.   Specifically, Chaparro asked, "We on for tomorrow?" JENKINS replied, "Tomorrow morning."

2.      On September 3, 2012, Chaparro Collected Money From ROCHA, JENKINS, and MADISON To Pay ARGUIJO For The 10 Kilograms of Cocaine.

24.      On or about September 3, 3012, at approximately 10:24 a.m. (Call #1382), Chaparro, who was using Target Phone 3, had a telephone conversation with ROCHA, who was using telephone number (773) 708-7681 ("Rocha Phone 1").[10] During the conversation Chaparro and ROCHA arranged to meet at the Chaparro Residence. Specifically, ROCHA asked, "Are you there [was Chaparro available to meet at the Chaparro Residence]?" Chaparro responded, "Yes, now, yes."

25.      On or about September 3, 2012, at approximately 10:43 a.m. (Call #1388), Chaparro, who was using Target Phone 3, had a telephone conversation with ROCHA, who was using Rocha Phone 1. During the conversation, ROCHA told Chaparro that he had arrived at the Chaparro Residence. Specifically, ROCHA told Chaparro, "I'm in front."

26.      At approximately 10:44 a.m., law enforcement officers conducting surveillance ("surveillance") observed an individual later identified as ROCHA[11] exit

---

[10]      ROCHA has been identified as the user of Rocha Phone 1 based in part upon the following: On or about September 27, 2012, a CPD Officer conducting surveillance in the area of the Chaparro Residence, having previously reviewed a known photograph of ROCHA, observed ROCHA standing on the front porch of the residence. At approximately 11:22 a.m, the officer placed a telephone call to telephone number (773) 708-7681 and observed ROCHA answer his phone, at which point the officer engaged ROCHA in a short conversation. Shortly thereafter, the CPD Officer reviewed Call #920, Call #1209, and Call #1365 from Target Phone 3, and Call #650, Call #660, and Call #3021 from Target Phone 6, all of which involved telephone conversations with an individual using telephone number (773) 708-7681, and determined that the user of that telephone was, in fact, ROCHA.

[11]      See footnote 10.

a Toyota vehicle carrying a black duffle bag and then enter the Chaparro Residence.
Approximately six minutes later, at approximately 10:50 a.m., surveillance observed
ROCHA exit the Chaparro Residence with the black duffle bag and depart from the
area in his Toyota vehicle. Based in part upon an intercepted conversations between
Chaparro and ARGUIJO, in which ARGUIJO told Chaparro that he would need to pay
for the 10 kilograms of cocaine upon receipt (*see* paragraph 21), and Chaparro and his
other narcotics customers (*see* paragraphs 20, 27), as well as later surveillance (*see*
paragraph 28), law enforcement believes that during this meeting, ROCHA dropped
off money to Chaparro for a kilogram of cocaine.

27.     On or about September 3, 2012, at approximately 11:26 a.m. (Call #1394),
Chaparro, who was using Target Phone 3, had a telephone conversation with
MADISON, who was using telephone number (773) 557-5174 ("Madison Phone 1").[12]
During the conversation, MADISON told Chaparro that he counted the money for the

_____

[12]     MADISON has been intercepted in conversations with Chaparro using
multiple phone numbers, including Madison Phone 1 and Madison Phone 2 (773-828-2322).
MADISON has been identified as the user of Madison Phone 1 and Madison Phone 2 based
in part upon the following. On or about August 14, 2012, law enforcement officers
conducted a lawful traffic stop of MADISON. During this stop, an officer dialed Madison
Phone 2, and another officer saw MADISON look at his phone, although MADISON did not
answer the call. MADISON identified himself to the officers and told the officers that his
phone number was Madison Phone 2. The same law enforcement officers subsequently
reviewed intercepted calls between Target Phone 3 and Madison Phone 2 and recognized
the voice speaking over Madison Phone 2 to be that of MADISON. On or about August 28,
2012, a CPD officer reviewed call numbers 296 and 298, which were between Chaparro,
who was using Target Phone 3, and MADISON, who was using Madison Phone 2, as well
as call numbers 413, 445, 463, 476, and 489, which were between Chaparro, who was using
Target Phone 3, and MADISON, who was using Madison Phone 1. The CPD officer
recognized the male voice speaking over Madison Phone 1 to be the same as the voice
speaking over Madison Phone 2.

narcotics and that he was on his way to the Chaparro Residence. Specifically, MADISON said, "I'm rolling out boss I'm gone [MADISON was on his way to the Chaparro Residence]." Chaparro replied, "Oh you are just now leaving? Right now?" MADISON replied, "I'm just leaving now had to count this paper [money to be used to pay for the narcotics]."

28.     On or about September 3, 2012, at approximately 12:13 p.m., surveillance observed Chaparro exit a vehicle in the vicinity of the Chaparro Residence and then enter the Chaparro Residence. At approximately 12:18 p.m., surveillance observed MADISON arrive in the area of the Chaparro Residence in a Honda Accord, exit the vehicle while holding a black bag, and then enter the Chaparro Residence. Based upon the intercepted conversation between MADISON and Chaparro detailed above (*see* paragraph 27), as well as earlier intercepted conversations between Chaparro and ARGUIJO, in which ARGUIJO told Chaparro that he would need to pay for the 10 kilograms of cocaine upon receipt (*see* paragraph 21), law enforcement believes that MADISON was dropping off money to Chaparro so that Chaparro could use the money to pay for the 10 kilograms of cocaine.

29.     On or about September 3, 2012, at approximately 12:19 a.m. (Call #1399), Chaparro, who was using Target Phone 3, had a telephone conversation with JENKINS, who was using Jenkins Phone 1. During the conversation, Chaparro and JENKINS agreed that JENKINS would pay for two kilograms of cocaine up front and then be fronted, or provided on credit, a third kilogram of cocaine. Specifically, Chaparro said, "Whenever you're ready to drop that [money] off, he's [ARGUIJO's]

20

gonna be here after two [2 p.m.], he says." JENKINS then said, "Okay, well I ain't gonna be able to get but two of them, the people ain't come up with the money. I'll jut grab a couple of them [JENKINS would only be able to pay for two kilograms of cocaine up front, not three]." Chaparro then said, "Alright well you know you can get [Chaparro would front JENKINS the third kilogram of cocaine], you know what I'm saying?" JENKINS then said, "Okay . . . then I'm gonna put on my clothes and head out that way."

30.     At approximately 12:34 p.m., surveillance observed MADISON leave the Chaparro Residence, enter the Honda Accord, and drive away from the area.  A few minutes later, at approximately 12:37 p.m., surveillance observed Chaparro exit the Chaparro Residence, enter a gold Mazda, and drive away.

31.     On or about September 3, 2012, at approximately 12:39 p.m. (Call #1404), Chaparro, who was using Target Phone 3, had a telephone conversation with MADISON, who was using Madison Phone 1.  During the conversation, MADISON asked Chaparro if MADISON's customer should bring the money for the cocaine the following day.  Specifically, MADISON asked, "[Be]cause today is a holiday, do you want me to just tell him [MADISON's customer] to bring the money to me in the morning?" Chaparro replied, "Yeah, in the morning is cool."

32.     On or about September 3, 2012, at approximately 12:41 p.m. (Call #1405), Chaparro, who was using Target Phone 3, had a telephone conversation with MADISON, who was using Madison Phone 1.  During the conversation, Chaparro told MADISON that he could sell MADISON three kilograms of cocaine.  Specifically,

21

MADISON said, "He [MADISON's narcotics customer] say could he do three [3 kilograms of cocaine]." Chaparro responded, "I got three, I got three."

3. **Chaparro Obtained 10 Kilograms Of Cocaine From ARGUIJO, And Then Distributed 3 Of The Kilograms to JENKINS And WHITE, and 1 Of The Kilograms to ROCHA.**

33. On or about September 3, 2012, at approximately 12:47 p.m. (Call #1407), Chaparro, who was using Target Phone 3, had a telephone conversation with ARGUIJO, who was using Arguijo Phone 1. During the conversation, ARGUIJO said that he would arrive at the Chaparro Residence in approximately 30 minutes. Specifically, ARGUIJO said, "I might get there [to the Chaparro Residence, with the cocaine] a little earlier, is that ok?" Chaparro responded by asking, "At what time will you come?" ARGUIJO said, "[I]n about half an hour." Chaparro then stated, "Let me call you back in about five."

34. On or about September 3, 2012, at approximately 12:47 p.m. (Call #1408), Chaparro, who was using Target Phone 3, had a telephone conversation with JENKINS, who was using Jenkins Phone 1. During the conversation, Chaparro told JENKINS that his narcotics source would arrive at the Chaparro Residence earlier than expected. Specifically, Chaparro said, "Yeah, dude's gonna be here earlier than what he said [the narcotics source was going to arrive at the Chaparro Residence with the cocaine earlier than expected]." Later in the conversation, JENKINS said, "I'll be there before an hour. Maybe like thirty more minutes man." Chaparro then said, "Ok, that's what he said. He be here in 30 minutes [the narcotics source would arrive at the Chaparro Residence in 30 minutes]."

22

35.     On or about September 3, 2012, at approximately 1:07 p.m. (Call #1416), Chaparro, who was using Target Phone 3, had a telephone conversation with ARGUIJO, who was using Arguijo Phone 1. During the conversation, Chaparro told ARGUIJO to come to the Chaparro Residence. Specifically, ARGUIJO asked, "Are you going to be ready or should I be late?" Chaparro responded, "No, take off [ARGUIJO should come to the Chaparro Residence]."

36.     Approximately 26 minutes later, at approximately 1:33 p.m., surveillance observed an unknown male, later identified as ARGUIJO,[13] approach the Chaparro Residence on foot and sit on the front porch.

37.     On or about September 3, 2012, at approximately 1:34 p.m. (Call #1422), Chaparro, who was using Target Phone 3, had a telephone conversation with ARGUIJO, who was using Arguijo Phone 1. During the conversation, ARGUIJO informed Chaparro that he had arrived at the Chaparro Residence. Specifically, ARGUIJO said, "I'm outside [outside the Chaparro Residence]." Later, Chaparro said, "Well, I'll get there [the Chaparro Residence] in about 5 minutes."

38.     On or about September 3, 2012, at approximately 1:35 p.m. (Call #1423), Chaparro, who was using Target Phone 3, had a telephone conversation with JENKINS, who was using Jenkins Phone 1. During the conversation, Chaparro asked JENKINS where he was because the narcotics source had arrived. Chaparro said, "Yeah, you ready yet or no [was JENKINS ready to pick up the three kilograms of

---

[13]     *See* footnote 7, above.

cocaine]?" JENKINS responded, "Yeah, I'm on Montrose man, stuck in this fucking traffic." Chaparro stated, "Oh, you're on your way to me [at the Chaparro Residence], though? . . . [Be]cause dude's already here, okay [ARGUIJO, Chaparro's cocaine source of supply, had already arrived at the Chaparro Residence]."

39.     At approximately 1:39 p.m., surveillance observed ARGUIJO sitting on the porch of the Chaparro Residence. Approximately two minutes later, at approximately 1:41 p.m., surveillance observed ARGUIJO walk to a 2001 black Acura vehicle parked in the area and retrieve a black suitcase and a shirt from the trunk. ARGUIJO then walked back to the porch of the Chaparro Residence. Surveillance further observed ARGUIJO place the black suitcase on the porch of the Chaparro Residence and cover it with the shirt. Based upon the interceptions described above (see paragraphs 20-22), law enforcement believes that the black suitcase contained approximately 10 kilograms of cocaine.

40.     Several minutes later, at approximately 1:44 p.m., surveillance observed Chaparro arrive at the Chaparro Residence. Surveillance then observed Chaparro and ARGUIJO, who was carrying the black suitcase, enter the Chaparro Residence.

41.     At approximately 1:59 p.m., surveillance officers, having previously viewed a photograph of JENKINS, observed JENKINS arrive in the vicinity of the Chaparro Residence in a black Jeep (hereinafter, the "black Jeep") and exit the black Jeep with a brown paper bag. Surveillance, having previously viewed a known photograph of WHITE, also observed WHITE exit the black Jeep carrying a black

24

purse. Surveillance then observed JENKINS and WHITE enter the Chaparro Residence.

42. Approximately four minutes later, at approximately 2:03 p.m., surveillance observed JENKINS and WHITE exit the Chaparro Residence and enter the black Jeep. Surveillance observed WHITE carrying the black purse, which she placed on the passenger seat of the black Jeep behind the driver's seat. At approximately the same time, surveillance observed ARGUIJO exit the Chaparro Residence and enter the same black Acura that he was observed removing the suitcase from earlier that day. Roving surveillance was then initiated on the black Jeep.

43. On or about September 3, 2012, at approximately 2:11 p.m. (Call #1427), Chaparro, who was using Target Phone 3, had a telephone conversation with ROCHA, who was using Rocha Phone 1. During the conversation, Chaparro told ROCHA to come to the Chaparro Residence to obtain one kilogram of cocaine. Specifically, ROCHA asked, "Should I go [should ROCHA travel to the Chaparro Residence to obtain the kilogram of cocaine he had paid for (*see* paragraph 26)]? . . . [U/I] Okay, bye."

44. On or about September 3, 2012, at approximately 2:31 p.m. (Call #1428), Chaparro, who was using Target Phone 3, had a telephone conversation with Mendez, who was using telephone number (608) 340-2441 ("Target Phone 4").[14] During the

---

[14] Mendez was identified as the user of Target Phone 4 based in part upon the following: On or about March 29, 2012, two Chicago Police Department officers had a conversation with Mendez that lasted approximately ten to fifteen minutes. On or about August 13, 2012, one of those same law enforcement officers listened to Call #15, Call #21,

conversation, Chaparro asked if there was a car at the Mendez Residence, as Chaparro needed to go there to store the remaining kilograms of cocaine. Specifically, Chaparro asked, "Is there a car in the garage [of the Mendez Residence]?" Mendez replied, "No." Chaparro then said, "Because I need to go there [to store narcotics] . . . that [the 10 kilograms of cocaine from ARGUIJO] came in."

45.     At approximately 2:33 p.m., surveillance observed ROCHA arrive in the area of the Chaparro residence in a tan Toyota.

46.     On or about September 3, 2012, at approximately 2:34 p.m. (Call #1429), Chaparro, who was using Target Phone 3, had a telephone conversation with ROCHA, who was using Rocha Phone 1. During the conversation, ROCHA told Chaparro that he had arrived at the Chaparro Residence. Specifically, ROCHA said, "Front cousin [ROCHA had arrived at the Chaparro Residence]."

47.     At approximately 2:34 p.m., surveillance observed ROCHA exit the tan Toyota and then walk to and enter the Chaparro Residence, carrying a clipboard in his hand. Approximately two minutes later, at approximately 2:36 p.m., surveillance observed ROCHA and Chaparro exit the Chaparro Residence and engage in a conversation while standing on the porch of the residence. Surveillance then observed

---

and Call #46, which were between Target Phone 3 and telephone number (773)319-1841 ("Mendez Phone A"). The officer identified the male voice speaking over Mendez Phone A in the three intercepted calls as that of Mendez. On or about September 1, 2012, a different Chicago Police Department officer listened to Call #21 and Call #46, which were between Target Phone 3 and Mendez Phone A, as well as Call #1267, which was between Target Phone 3 and Target Phone 4. The officer identified the male voice speaking over Mendez Phone A to be the same male voice speaking over Target Phone 4.

ROCHA conceal a brick-shaped object behind the clipboard while he walked to his tan Toyota. ROCHA then departed from the area. Based upon the calls and surveillance detailed above (*see* paragraphs 19-46), law enforcement believes that the brick-shaped object that ROCHA attempted to conceal behind the clipboard was one kilogram of cocaine.

48.    At approximately 2:39 p.m., surveillance observed Chaparro exit the Chaparro Residence with a plastic shopping bag containing brick-shaped objects. Chaparro then entered his gold Mazda and drove away from the area. Roving surveillance was initiated, and surveillance followed Chaparro the area of the Mendez Residence. At approximately 2:43 p.m., surveillance observed Chaparro arrive back at the Chaparro Residence, exit his vehicle with the plastic bag containing brick-shaped objects, and then enter the residence.

49.    On or about September 3, 2012, at approximately 2:44 p.m. (Call #1430), Chaparro, who was using Target Phone 3, had a telephone conversation with Mendez, who was using Target Phone 4. During the conversation, Chaparro told Mendez that he could not get inside the Mendez Residence. Specifically, Chaparro asked, "Where's the remote [to the garage door of the Mendez Residence]?" Mendez replied, "[T]he only thing I got is the one he put for me on the key chain [Mendez only had one garage opener]." Chaparro then asked, "[W]here the other one I gave you?" Later, Mendez replied, "I gave them back to you." Chaparro then said, "But it doesn't open the door when I'm in front of it and I'm pushing and it doesn't open it up [Chaparro could not open the garage door]." Based upon the calls and surveillance detailed above (*see*

27

paragraphs 48-49), law enforcement believes that Chaparro was attempting to store the remaining kilograms of cocaine at the Mendez Residence, but was unable to gain entry to the Mendez Residence.

### 4. Law Enforcement Covertly Seized Approximately 3 Kilograms of Cocaine From JENKINS And WHITE.

50.     After JENKINS and WHITE drove away from the Chaparro Residence (*see* paragraph 42, above), roving surveillance officers followed the black Jeep to the area of 5111 W. Montrose. There, a CPD Officer acting in an undercover capacity (the "UCO") positioned an undercover vehicle that the UCO was driving in front of the black Jeep, which was being driven by WHITE. While breaking for a red light, the black Jeep bumped the UCO's vehicle. Moments later, at approximately 2:17 p.m., a CPD Officer in a marked police car stopped at the scene to conduct a traffic investigation. WHITE and JENKINS provided the CPD Officer with their driver's licenses, and JENKINS's driver license identified him as Paul Jenkins. WHITE gave the CPD Officer permission to move the black Jeep, which was blocking traffic. As the CPD Officer sat in the front seat of the vehicle, WHITE was observed reaching into the backseat and retrieving the black purse, which surveillance officers had previously observed her taking into and out of the Chaparro Residence. The CPD Officer asked WHITE to leave the purse in the vehicle, at which time the officer observed WHITE throw the purse into the back cargo area of the black Jeep. The CPD Officer then moved the black Jeep and parked it approximately 30 feet away and, as he was exiting the vehicle, observed a package protruding from the open black purse that appeared,

based upon the officer's training and experience, to be a kilogram package of narcotics. Another CPD Officer in the immediate area seized the black purse. The black Jeep was subsequently returned to JENKINS and WHITE, who left the scene. Later that day, law enforcement officers search the black purse, which was found to contain three packages of suspected narcotics, each of which was separately encased in brown tape. Law enforcement officers subsequently field-tested the substance in the packages, and the substance tested positive for the presence of cocaine. The suspected cocaine was later submitted to the laboratory for forensic analysis, and the results confirmed that the packages contained approximately 2.959 kilograms of cocaine.

51.     On or about September 3, 2012, at approximately 2:46 p.m. (Call #1432), Chaparro, who was using Target Phone 3, had a telephone conversation with JENKINS, who was using Jenkins Phone 1. During this conversation, JENKINS told Chaparro that police had pulled him over and taken the cocaine.  Specifically, JENKINS said, "Man, these people just took all my shit [the three kilograms of cocaine] man.  They following us man." Chaparro responded, "Who?" JENKINS stated, "The police man. [A man] back up a bust the mother fucking car and the police was coming down the street right behind them and pulled us over, took my car and put it in the alley and was running a check on his car and got her purse [WHITE's purse] man. The shit [the three kilograms of cocaine] was all in her purse man."

52.     On or about September 3, 2012, at approximately 2:51 p.m. (Call #1433), Chaparro, who was using Target Phone 3, had a telephone conversation with JENKINS, who was using Jenkins Phone 1. During the conversation, the two men

again discussed how the police took WHITE's purse, which contained three kilograms of cocaine. Specifically, JENKINS said, "We don't understand it." Chaparro then asked, "They stopped you? How they just gonna take that [the purse containing the three kilograms of cocaine] and go?" JENKINS responded, "I don't know . . . We got out of the car. She [WHITE] threw her purse in the back, behind the back seat. 'Cause she didn't want the po . . . she toss it [the purse] in the back. Man, the police got out of his car and told us to go over , stand on the curb . . . Then they told us to go on to the crib and we get in the car and the purse gone, man."

53.     On or about September 3, 2012, at approximately 2:54 p.m. (Call #1434), Chaparro, who was using Target Phone 3, had a telephone conversation with Mendez, who was using Target Phone 4. During the conversation, Chaparro told Mendez that something happened with the cocaine distributed to JENKINS. Specifically, Chaparro said, "Johnny, how close are you, because I'm sweating here. Something happened." Mendez responded, "I'm flying that way."

54.     On or about September 3, 2012, at approximately 2:55 p.m. (Call #1435), Chaparro, who was using Target Phone 3, had a telephone conversation with Mendez, who was using Target Phone 4. During the conversation, Chaparro asked Mendez for the alarm code to the Mendez Residence. Specifically, Chaparro asked, "[W]hat's the code to your alarm. I got the key to your house." Mendez replied, "Alright, let me call. I'm gonna get it from [Individual B]. I'll use the remote. I got it on my other phone." Later, Mendez said, "Zero eight one one."

30

55.     At approximately 2:55 p.m., surveillance observed Chaparro, who was carrying the same plastic shopping bag that contained brick-shaped objects, exit the Chaparro Residence, enter the gold Mazda, and drive away from the area. Approximately two minutes later, at approximately 2:57 p.m., surveillance observed Chaparro, driving the gold Mazda, arrive at the Mendez Residence, exit the vehicle carrying the plastic bag containing the brick-shaped objects, and enter the residence. A few minutes later, Chaparro exited the Mendez Residence without the plastic bag, enter his vehicle, and drive away. Approximately six minutes later, at approximately 3:03 p.m., surveillance observed Chaparro return to the Chaparro Residence. Based in part upon the intercepted calls and surveillance discussed above (*see* paragraphs 48-49, and 53-55), law enforcement believes that Chaparro stored six of the remaining ten kilograms of cocaine in the Mendez Residence.

**C.      On September 4, 2012, Chaparro Distributed 3 Of The 10 Kilograms of Cocaine to MADISON.**

56.     On or about September 4, 2012, at approximately 9:27 a.m. (Call #1475), Chaparro, who was using Target Phone 3, had a telephone conversation with MADISON, who was using Madison Phone 1. During the conversation, Chaparro told MADISON he could obtain two or three kilograms of cocaine. Specfically, MADISON said, "Can I grab those two or whatever [could MADISON obtain two or more kilograms of cocaine from Chaparro]?" CHAPARRO responded, "Yeah." Later, MADISON asked, "You want me to come now?" Chaparro then said, "Yeah." MADISON then said, "Let me call him. What was it? Three or two [three or two

kilograms of cocaine]?" Chaparro responded, "Two or three [two or three kilograms of cocaine]." MADISON then said, "Okay, let me call him [MADISON's cocaine customer]."

57. On or about September 4, 2012, at approximately 9:28 a.m. (Call #1476), Chaparro, who was using Target Phone 3, had a telephone conversation with MADISON, who was using Madison Phone 1. During the conversation, Chaparro and MADISON confirmed that the price per kilogram of cocaine was $38,000. Specifically, MADISON said, "37, right [$37,000 per kilogram of cocaine]?" Later, Chaparro responded, "No, 8 [the price per kilogram of cocaine was $38,000]."

58. On or about September 4, 2012, at approximately 9:42 a.m., Chaparro, who was using Target Phone 3, had a telephone conversation with MADISON, who was using Madison Phone 1. During the conversation, MADISON confirmed that his customer wanted three kilograms of cocaine. Specifically, MADISON said, "I'll be there to get the three [three kilograms of cocaine]. I'm just waiting on him [MADISON was waiting for his customer to bring money for the narcotics]."

59. On or about September 4, 2012, at approximately 9:47 a.m. (Call #1482), Chaparro, who was using Target Phone 3, had a telephone conversation with Mendez, who was using Target Phone 4. During the conversation, Chaparro asked Mendez whether he was at the Mendez Residence. Specifically, Chaparro said, "You at home [at the Mendez Residence]?" Mendez responded, "Yeah, I am . . . waiting to get picked up. . . [Individual B] is here, though."

60.     On or about September 4, 2012, at approximately 9:49 a.m. (Call #1483), Chaparro, who was using Target Phone 3, had a telephone conversation with Mendez, who was using Target Phone 4. During the conversation, Chaparro told Mendez to put three kilograms of cocaine on the side for him to pick up. Specifically, Chaparro said, "Do me a favor. Can you take . . . out before you leave . . . three of the black ones [could Mendez set aside 3 kilograms of cocaine for Chaparro]?" Mendez responded, "Okay."

61.     On or about September 4, 2012, at approximately 10:50 a.m. (Call #1488), Chaparro, who was using Target Phone 3, had a telephone conversation with Mendez, who was using Target Phone 4. During the conversation, Mendez told Chaparro that he put three kilograms of cocaine outside. Specifically, Mendez said, "Look, I already left, but [I] left that [the three kilograms of cocaine] outside." Chaparro responded, "Okay."

62.     At approximately 11:24 a.m., surveillance established in the area of the Chaparro Residence observed MADISON park a Honda Accord in the area of the Chaparro Residence. Surveillance then observed MADISON exit his vehicle, open the vehicle's trunk, and retrieve a large red bag. Surveillance then observed MADISON, carrying the large red bag, enter the Chaparro Residence.

63.     At approximately 11:31 a.m., surveillance observed Chaparro exit the Chaparro Residence, enter a gold Mazda, and drive away from the Chaparro Residence. A few moments later, surveillance established in the area of the Mendez Residence observed Chaparro arrive at the Mendez Residence.

33

64.     At approximately 11:40 a.m., surveillance established in the area of of the Chaparro Residence observed Chaparro exit his vehicle with a black bag with red handles and enter the Chaparro Residence. Approximately four minutes later, at approximately 11:44 a.m., surveillance observed MADISON exit the Chaparro Residence carrying the red bag. Surveillance then observed MADISON place the red bag on the passenger side of his vehicle and drive away from the area. Based upon the telephone calls and surveillance detailed above, law enforcement believes that MADISON obtained three kilograms of cocaine from Chaparro, which he later delivered to his narcotics customer.

**D.      On September 19, 2012, MELENDEZ Obtained 225 Grams Of Heroin From Mendez And Individual B.**

65.     On or about September 19, 2012, at approximately 5:59 p.m. (Call #342), Mendez, who was using Target Phone 4, had a telephone conversation with an unknown male ("UM4-342"), who was using telephone number (414) 426-9928 ("UM4-342 Phone 1"). During their conversation, UM4-342 ordered 225 grams of heroin from Mendez. Specifically, UM4-342 said, "I am planning to go over if we go today [UM4-342 was planning to travel from Wisconsin to Chicago to obtain heroin from Mendez]." Mendez responded, "Yeah, well, come by." UM4-342 then said, "Let's look at the number 225 [UM4-342 was looking to obtain 225 grams of heroin from Mendez]."[15]

---

[15]     Based upon my training and experience, I believe that UM4-342's reference to "225" is consistent with the way narcotics traffickers of heroin refer to distribution quantities of heroin, as opposed to other types of illegal narcotics.

66.     On or about September 19, 2012, at approximately 8:39 p.m. (Call #354), Mendez, who was using Target Phone 4, had a telephone conversation with MELENDEZ, who was using telephone number (414)236-2258 ("Melendez Phone 1").[16] During the conversation, MELENDEZ told Mendez that he would arrive at the Mendez Residence in approximately 20 minutes. Specifically, MELENDEZ said, "I'll be there [the Mendez Residence] like in a bit . . . in 20 minutes or something."

67.     On or about September 19, 2012, at approximately 8:40 p.m. (Call #3393), Mendez, who was using Target Phone 5,[17] had a telephone conversation with Individual B, who was using telephone number (312) 434-0494 ("Individual B Phone 1"). During the conversation, Mendez told Individual B that MELENDEZ was coming

---

[16]     MELENDEZ has been identified as the user of telephone number (414)236-2258 based in part upon the following information: On or about September 19, 2012, after intercepting a series of telephone conversation between Target Phone 4, Target Phone 5 and telephone number (414) 236-2258 indicating that a narcotics customer, "Joel," would be arriving at the Mendez Residence around 9 p.m. to pick up narcotics (see paragraphs 65-70), at approximately 9:29 p.m., a CPD officer observed a then-unknown male arrive at the Mendez Residence, enter the residence with a backpack, and then exit the residence (see paragraphs 72-74, below). Surveillance then observed the unknown male enter a black Jeep Liberty and drive away from the area, at one point secreting the backpack in another area of the vehicle (see paragraph 75). Later, the same CPD officer reviewed a driver's license photograph of MELENDEZ and identified MELENDEZ as the same person who he observed on September 19, 2012, as discussed above.

[17]     Mendez been identified as the user of Target Phone 5 based in part on the following information. On or about March 29, 2012, two Chicago Police Department officers had a conversation with Mendez that lasted approximately ten to fifteen minutes. On or about August 13, 2012, one of those same law enforcement officers listened to call numbers 15, 21, and 46, which were between Target Phone 3 and telephone number 773-319-1841 ("Mendez Phone A"). The officer identified the male voice speaking over Mendez Phone A in the three intercepted calls as that of Mendez. On or about August 14, 2012, a different CPD officer listened to call numbers 21 and 46, which were between Target Phone 3 and Mendez Phone A, as well as call number 238, which was between Target Phone 3 and Target Phone 5. The officer identified the male voice speaking over Mendez Phone A to be the same male voice speaking over Target Phone 5.

to the Mendez Residence to pick up 225 grams of heroin. Specifically, Mendez said, "Open a new one, in the green one [the heroin in green packaging] . . . Joel is coming for two twenty-five [225 grams of heroin]." Individual B asked, "Two twenty-five [225 grams of heroin]?" Mendez confirmed, "Yeah . . . You got to take 50 out of the new one and put it with the rest of that to make two and a quarter [Individual B needed to mix heroin from two different packages to put together 225 grams of heroin] . . . He should be there in a few minutes."

68.     On or about September 19, 2012, at approximately 9:08 p.m. (Call #358), Mendez, who was using Target Phone 4, had a telephone conversation with MELENDEZ, who was using Melendez Phone 1. During the conversation, MELENDEZ told Mendez that he was close to the Mendez Residence. Specifically, MELENDEZ said, "I'm like a block away [from the Mendez Residence]." Mendez then responded, "Alright, well, park in the front."

69.     On or about September 19, 2012, at approximately 9:23 p.m. (Call #360), Mendez, who was using Target Phone 4, had a telephone conversation with MELENDEZ, who was using Melendez Phone 1. During the conversation, MELENDEZ confirmed with Mendez that he had arrived at the Mendez Residence. Specifically, Mendez said, "[J]ust park in the front and my girl's already there [Individual B was at the Mendez Residence]." MELENDEZ responded, "Okay, I'm already here."

70.     On or about September 19, 2012, at approximately 9:23 p.m. (Call #361), Mendez, who was using Target Phone 4, had a telephone conversation with

36

MELENDEZ, who was using Melendez Phone 1. During the conversation, Mendez told MELENDEZ to go to the door. Specifically, Mendez said, "Go to the door, she [Individual B] is there." MELENDEZ responded, "Okay, good."

71. At approximately 9:25 p.m., surveillance established in the area of the Mendez Residence observed Individual B open the front door of the residence and look out. Surveillance observed Individual B then periodically look out from the door.

72. At approximately 9:29 p.m., surveillance observed a then-unknown male, later identified as MELENDEZ,[18] exit a vehicle parked on the 3800 block of N. Olcott carrying a back pack and walk south on Olcott. Approximately two minutes later, at 9:31 p.m., surveillance observed MELENDEZ enter the Mendez Residence and close the door behind him.

73. According to toll records, on or about September 19, 2012, at approximately 9:32 p.m., Target Phone 5 and telephone number (312)434-0494, believed to be used by Individual B, were in contact via text messaging. Based in part upon the telephone calls and surveillance detailed above (*see* paragraph 67-72), law enforcement believes that, in the text message, Individual B and Mendez discussed the impending 225 gram heroin distribution to MELENDEZ.

74. At approximately 9:33 p.m., surveillance observed MELENDEZ exit the Mendez Residence, enter a black Jeep Liberty bearing Wisconsin license plates, and drive away from the area. Roving surveillance was initiated.

---

[18]     *See* footnote 16.

75.     At approximately 9:41 p.m., surveillance observed MELENDEZ pull the black Jeep Liberty over on the east side of Addison Street. MELENDEZ then exited the vehicle with the back pack and appeared to be secreting the bag in another section of the vehicle. MELENDEZ then re-entered the vehicle and drove away from the area.

E.     **On November 26, 2012, Law Enforcement Seized Approximately 2 Kilograms Of Cocaine From ARGUIJO That Was Intended For Delivery to Chaparro and Mendez.**

76.     On or about November 25, 2012, at approximately 7:14 p.m. (Call #231), Chaparro, who was using Target Phone 12,[19] had a telephone conversation with ARGUIJO, who was using telephone number 773-703-0518 ("Arguijo Phone 2").[20] During the conversation, Chaparro and ARGUIJO discussed ARGUIJO delivering narcotics to Chaparro the next day. Specifically, Chaparro stated, "I'm cool, I'm at home. You're going to call me when you're headed over here, right [Chaparro wanted ARGUIJO to call before coming to the Chaparro Residence to deliver narcotics]?"

---

[19]     Chaparro has been identified as the user of Target Phone 12 based in part on the following information. Pursuant to the September 19, 2012 Order (*see* paragraph 7(e)), law enforcement intercepted wire communications over Target Phone 6, used by Chaparro. CPD Officer Dolan reviewed interceptions over that phone, including Call #683 and Call #715, and thus is familiar with Chaparro's Voice. Pursuant to the October 12, 2012 Order (*see* paragraph 7(f)), law enforcement intercepted wire communications over Target Phone 7, used by Mendez. On or about November 8, 2012, at approximately 12:08 p.m. (Call #3716), Mendez, who was using Target Phone 7, had a telephone conversation with the user of Target Phone 12. On or about November 19, 2012, Officer Dolan listened to Call #3716, as well as Call #4031, Call #4047, Call #4088, Call #4096, and Call #4719, all of which were between Mendez, using Target Phone 7, and the user of Target Phone 12, and determined that the user of Target Phone 12 was Chaparro.

[20]     *See* footnote 7.

ARGUIJO responded, "Yes." Chaparro asked, "Is it going to be early or around what time?" ARGUIJO stated, "I don't think so, around twelve [12 p.m.] more or less."

77.     The next day, on or about November 26, 2012, at approximately 12:12 p.m. (Call #235), Chaparro, who was using Target Phone 12, had a telephone conversation with ARGUIJO, who was using Arguijo Phone 2. During the call, ARGUIJO told Chaparro that he would be there soon and that the amount of drugs he would be delivering might be less than what they had previously discussed. Specifically, Chaparro stated, "Good, good, just here waiting for you." ARGUIJO responded, "Yes, in a bit. In a bit I will go over there [the narcotics courier would deliver narcotics to Chaparro soon]." Chaparro then said, "Yes, ok, you call me when you are going to come over here [the Chaparro Residence]." ARGUIJO stated, "The only thing I was going to tell you, it might be two hours sooner than what we said [ARGUIJO had two kilograms of cocaine for Chaparro]." Chaparro stated, "Oh no but I did tell you to separate it [the narcotics]." ARGUIJO stated, "Yes but no, not because that, no because that. The other people no. Not this one and better. They going to give me two [two kilograms] for sure you understand me."

78.     On or about November 26, 2012, at approximately 2:21 p.m. (Call #246), Chaparro, who was using Target Phone 12, had a telephone conversation with ARGUIJO, who was using Arguijo Phone 2. During this call, ARGUIJO told Chaparro that he would be at the Chaparro Residence in about an hour and a half. Specifically, ARGUIJO stated, "How does it look to you if I arrive in an hour or an hour or a half?" Chaparro stated, "Like an hour?" ARGUIJO stated, "Yes."

79.     On or about November 26, 2012, at approximately 3:52 p.m. (Call #255), Chaparro, who was using Target Phone 12, had a telephone conversation with ARGUIJO, who was using Arguijo Phone 2.   During this call, ARGUIJO asked Chaparro if he should wait for him.  Specifically, ARGUIJO stated, "Um, should I wait for you outside or?"  Chaparro stated, "I am arriving soon.  I had to get my child at school but I should arrive there soon."

80.     Based upon the telephone calls between Chaparro and ARGUIJO described above, law enforcement established surveillance in the vicinity of the Chaparro Residence.  At approximately 3:52 p.m., two minutes after the call described above, a CPD Officer observed ARGUIJO driving westbound on Grace near the Chaparro Residence in the same black Acura described in paragraphs 39 and 42, above.  At approximately 3:54 p.m., two CPD officers conducted a traffic stop of ARGUIJO at the corner of Grace and Oketo, an area close to the Chaparro Residence. A CPD Officer asked ARGUIJO his name and ARGUIJO identified himself as Jose Arguijo.  One of the officers asked ARGUIJO if he had a license, and when ARGUIJO stated that he did not have a license, the officer asked him to get out of the car.  While one officer conducted a protective pat down of ARGUIJO for weapons with negative results, another officer looked inside the black Acura and observed the panel in the back of the passenger's seat pealed back and observed several rectangular objects near the paneled area which the officer suspected to be packages of narcotics.  A CPD officer then drove the black Acura to the police station, where law enforcement had a trained

40

canine conduct a sniff test of the black Acura. The canine sniffed the outside of the vehicle and positively indicated for the presence of narcotics.

81. After the positive indication from the canine, a law enforcement officer removed the objects that were observed near the paneled area in the back seat of the car. The objects were three packages that appeared to be kilogram packages of narcotics. Law enforcement officer subsequently field-tested the substance in the packages, and the substance tested positive for the presence of cocaine. The kilogram-shaped packages have been submitted to the laboratory for analysis, and law enforcement is awaiting the results. ARGUIJO was not taken into custody at that time so as not to compromise the ongoing investigation.

**F.      On November 26, 2012, PAYNE and Individual C Conspired to Possess Two Semi-Automatic Tech 9 Firearms.**

82. On or about November 26, 2012, at approximately 7:45 p.m. (Call #3015), PAYNE, who was using Target Phone 11,[21] had a telephone conversation with

---

[21] PAYNE has been identified as the user of Target Phone 11 based in part on the following information. On or about March 29, 2012, CPD Officer Dolan and another officer conducted a traffic stop on a vehicle. The driver of the vehicle provided an Illinois identification card, which identified the driver as PAYNE. In addition, during the stop, the CPD officers engaged in a conversation with PAYNE for approximately 10 minutes. Then, on or about August 9, 2012, Chief Judge James Holderman authorized the interception of wire communications over Target Phone 3 (*see* paragraph 7(a)). On August 28, 2012, CPD Officer Dolan listened to Call #1010 and Call # 1015, both intercepted over Target Phone 3 and both of which involve calls made from telephone number 920-941-0444 (Target Phone 8). CPD Officer Dolan identified the voice of the user of Target Phone 8 as that of PAYNE. Then, on or about October 12, 2012, Chief Judge James Holderman authorized the interception of wire communications over one of MENDEZ's cellular telephones (Target Phone 7) and one of PAYNE's cellular telephones (Target Phone 8). Then, on November 9, 2012, CPD Officer Lopez listened to Call #3125, Call #3144, and Call #3897, all intercepted over Target Phone 7 and both of which involved calls made from 773-666-3674 (Target Phone 11). CPD Officer Lopez identified the voice of the user of Target Phone 11 as that of

41

Individual C, who was using telephone number 312-320-7154 ("Individual C Phone 1").[22] During the conversation, PAYNE and Individual C discussed PAYNE needing a gun because he was going to a memorial service where rival gang members would be present. Specifically, PAYNE stated, "I'm finna motherfuckin slide by motherfuckin Central Park and Division, they having a little, little memorial over there for Twin [PAYNE was going to a memorial service for an individual nicknamed "Twin" at Central Park and Division streets]." Soon thereafter, Individual C asked, "You still got that [a gun] on you?" PAYNE responded, "No, I put them [the two guns later recovered by CPD (*see* paragraph 86)] up. It's at the crib [PAYNE had left his guns at his house]." Individual C responded, "Uhm shit I was gonna say slide one up there, I say, just drop one off to me therefore anything pop off, you already know [Individual C wanted PAYNE and himself to have guns in case anything occurred at the memorial]." PAYNE replied, "You want to get it at the crib [PAYNE asked Individual C if he would get his gun from his residence]?" Individual C asked, "Is it [the gun] in the room?" PAYNE responded, "Naw." Individual C stated, "Don't matter want me to grab [U/I]?" PAYNE stated, "Think you can get your hands on something else and be right there with it [could Individual C quickly get a gun from another location]?" Individual C

---

PAYNE.

[22]     Individual C has been identified as the user of Individual C Phone 1 based in part upon the following information. On or about November 26, 2012, law enforcement officers participated in the arrest of Individual C and engaged Individual C in conversation for approximately one hour. On or about the same date, the same law enforcement officers listed to Call #3015, Call #3042, and Call #3055, which were between Target Phone 11 and Individual C Phone 1. The officers identified the voice speaking over Individual C Phone 1 as that of Individual C.

responded, "Naw [no]." Later in the conversation, PAYNE stated, "Hey, you got to go all the way to the back right. . . . You know where we be smokin at in the room where we be smokin at all in the back [PAYNE told Individual C that the gun in PAYNE's residence was located in a back room where they had smoked previously]. . . .The window . . . it's all the way in the back of the store . . . on top of the window [the gun was in the back of PAYNE's residence on top of the window]." Individual C then asked, "By the back door?" PAYNE stated, "In the back of the store [PAYNE's residence] on top of the window." Individual C stated, "Ok, I know what you talkin' about."

83.     Approximately twenty minutes later, at approximately 8:05 p.m. (Call #3042), PAYNE, who was using Target Phone 11, had a telephone conversation with Individual C, who was using Individual C Phone 1. During the conversation, Individual C asked PAYNE how Individual C should go about getting the gun retrieved from PAYNE's house, which was now in Individual C's vehicle, to PAYNE. Specifically, Individual C stated, "How you wanna do this, you want me to leave my car parked right here [Individual C asked how PAYNE would get the gun from Individual C's car]?" PAYNE asked, "Where?" Individual C responded, "Right here on C.P. [the car was parked on Central Park]." PAYNE stated, "Ah hell yeah that would be good . . . shit park right there [Individual C should leave his car on Central Park]." Individual C responded, "There's a whole bunch right here [there were a lot of rival gang members nearby] . . . When you come on just up, just call me so I can come and bring the keys [Individual C asked PAYNE to call him when he was close to the car]."

43

84. On or about November 26, 2012, at approximately 8:18 p.m. (Call #3055), PAYNE, who was using Target Phone 11, had a telephone conversation with Individual C, who was using Individual C Phone 1. During the conversation, Individual C alerted PAYNE that a rival gang member was in the area and told PAYNE where the guns were located in the car. Specifically, Individual C stated, "Dude just came through there too . . . he in a white Buick . . . .[a rival gang member in a white Buick drove by]" PAYNE asked, "Who?" Individual C responded, "Marquito [the rival gang member]." PAYNE stated, "White Buick truck?" Individual C stated, "Yep . . . it's a rental, cause he came over there scoping the scene [the rival gang member was in a rented car to avoid detection while driving near the memorial service]." PAYNE later asked, "It's open or what [was Individual C's car unlocked]?" Individual C stated, "Naw, it ain't [the car was not unlocked]. I'm waiting for you to call me then I'm gonna open it." PAYNE stated, "Alright, I'll be pulling up . . . I'm on Grand and Sacramento." Individual C stated, "Hey . . . one of them already out. There's one in the chamber too [one of the guns in Individual C's car was out, a bullet was in the chamber and it was ready to fire]." PAYNE asked, "Where it's at [where was the gun located in the car]?" Individual C replied, "It's . . . under there . . . it's on the back on the floor. It's underneath the clothes. It's got the clothes on the back seat like dress costumes, it's underneath the costumes [the gun was on the floor of the backseat of Individual C's car, underneath some clothes]."

85. Based upon the calls between PAYNE and Individual C described above (*see* paragraphs 82-84), law enforcement established surveillance in the area of

Division and Central Park streets in Chicago, Illinois. At approximately 8:45 p.m. on November 26, 2012, surveillance officers familiar with Individual C's appearance, having previously reviewed a known booking photograph of him, observed Individual C standing on Central Park near a 2005 Chrysler 300.[23]

86.     Several minutes later, at approximately 8:48 p.m., surveillance observed Individual C leaning to the rear of the vehicle and exiting the vehicle. After Individual C exited the Chrysler 300, surveillance officers approached Individual C, at which time Individual C pointed his hand at the car and appeared to use the keyfob for the car, which made the cars lights flash. Individual C then looked in the officers direction and ran eastbound through the parking lot of a drug store. As Individual C was running, law enforcement observed Individual C throw his car keys onto the roof of the drug store and run into the drug store. Two officers detained Individual C in the drug store. Individual C then gave verbal consent for law enforcement officers to retrieve the guns from Individual C's vehicle. A law enforcement officer then retrieved the car keys that Individual C had thrown on the roof of the drug store, and law enforcement used Individual C's keys to enter the Chrysler 300, where a law enforcement officer found two Tech 9 semi-automatic pistols on the floor of the backseat. Specifically, officers recovered one Tech 9 semi-automatic pistol bearing serial number 125755, which was loaded with approximately 30 live rounds, and one Tech 9 semi-automatic pistol, which

---

[23]     A record search conducted by law enforcement revealed that this vehicle is registered to Individual C.

had a defaced serial number and was loaded with approximately 28 live rounds, one of which was in the chamber.

### G. On November 30, 2012, VALENCIA-PANTOJA Worked With Cuevas To Distribute 2 Kilograms Of Cocaine To Chaparro And Mendez.

#### 1. On November 29, 2012, Chaparro and VALENCIA-PANTOJA Met To Discuss The Impending Narcotics Transaction.

87.     On or about November 29, 2012, at approximately 12:54 p.m. (Call #414), Chaparro, who was using Target Phone 12, had a telephone conversation with VALENCIA-PANTOJA, who was using telephone number 773-562-3429 ("Valencia Phone 1").[24] During the conversation, Chaparro and VALENCIA-PANTOJA discussed

---

[24]     Law enforcement identified VALENCIA-PANTOJA as the user of telephone number (773) 562-3429 based in part upon the following information: On or about November 29, 2012, law enforcement intercepted wire communications between a then-unknown male and Chaparro, who was using Target Phone 12, in which the unknown male and Chaparro arranged to meet at a parking lot located at 2820 N. Cicero (*see* paragraph 88). Surveillance then observed a then-unknown male meet with Chaparro in a vehicle being driven by Chaparro (*see* paragraph 89). The following day, law enforcement intercepted a series of wire communications between Chaparro and the unknown male using telephone number (773) 562-3429, during which the unknown male and Chaparro discussed a narcotics courier working with the unknown male (later identified as Lucio Cuevas) to deliver 2 kilograms of cocaine to Chaparro – cocaine seized by law enforcement prior to its delivery to Chaparro (*see* paragraphs 90-100). Following this series of events, on December 14, 2012, law enforcement officers recognized an individual exiting the residence at 4826 W. Oakdate and entering a vehicle parked in the area as being the same individual previously observed meeting with Chaparro on November 29, 2012, as discussed above. After the unknown male drove away from the area, law enforcement conducted a traffic stop on the unknown male's vehicle. During the traffic stop, the unknown male produced a Mexican identification card bearing his photograph and reflecting the name "Antonio Valencia-Pantoja." The unknown male was unable to produce a valid license, and was taken into custody. During the processing of the unknown male, in which CPD Officer Jorge Lopez assisted, the unknown male identified himself as VALENCIA-PANTOJA. After speaking with VALENCIA-PANTOJA during processing, Officer Lopez subsequently listened to Call #87, 88, 414, 436, 475, and 479, which were telephone conversations between Chaparro, who was using Target Phone 12, and the then unknown-male, who was using telephone number (773)562-3429, and determined that the user of telephone number (773)562-3429 was VALENCIA-PANTOJA.

meeting later to have a discussion about an impending narcotics transaction. Specifically, Chaparro said, "When you . . . are around then call me to see you around there [Chaparro wanted to meet with VALENCIA-PANTOJA later in the day to discuss an impending narcotics transaction]." VALENCIA-PANTOJA responded, "Okay, I will see you in a few . . . I will call you when I am near to go and talk."

88.    On or about November 29, 2012, at approximately 4:56 p.m. (Call#445), Chaparro, who was using Target Phone 12, had a telephone conversation with VALENCIA-PANTOJA, who was using Valencia Phone 1. During the conversation, VALENCIA-PANTOJA told Chaparro to meet him in the parking lot of a food store located at 2820 N. Cicero, Chicago, Illinois. Specifically, Chaparro said, "I am heading that way." Later, VALENCIA-PANTOJA stated, "I will . . . over there [near Fullerton and Kedzie] by the stores [located in the area of 2820 N. Cicero (*see* paragraph 89, below)]."

89.    At approximately 5:34 p.m., surveillance in the area of 2820 N. Cicero observed Chaparro and an unknown male, later identified as VALENCIA-PANTOJA,[25] sitting in a Chevy Cobalt parked in the parking lot located at 2820 N. Cicero. Approximately two minutes later, at approximately 5:36 p.m., surveillance observed VALENCIA-PANTOJA exit the Chevy Cobalt, enter a gray Nissan, and drive away from the area. Based in part upon the telephone calls, surveillance, and the seizure of approximately two kilograms of cocaine on November 30, 2012 from Lucio Cuevas (*see*

---

[25]    *See* footnote 24.

47

paragraphs 87-89, above, and 90-100, below), law enforcement believes that Chaparro and VALENCIA-PANTOJA met in the parking lot to discuss the impending 2 kilogram cocaine transaction (*see* paragraphs 90-100, below).

> 2.  On November 30, 2012, VALENCIA-PANTOJA and Cuevas Worked Together In An Attempt To Deliver Two Kilograms Of Cocaine To Chaparro and Mendez.

90.  On or about November 30, 2012, at approximately 9:58 a.m. (Call #475), Chaparro, who was using Target Phone 12, had a telephone conversation with VALENCIA-PANTOJA, who was using Valencia Phone 1. During the conversation, Chaparro and VALENCIA-PANTOJA discussed conducting the impending 2 kilogram cocaine transaction at approximately 11 a.m. Specifically, Chaparro asked, "At eleven is good [could they conduct the narcotics transaction around 11 a.m.]?" VALENCIA-PANTOJA responded, "At eleven."

91.  At approximately 10:38 a.m., surveillance established in the area of the Chaparro Residence observed Chaparro leave the Chaparro Residence, enter a gold Mazda, and depart from the area. At that point, law enforcement initiated roving surveillance. Approximately one minute later, at approximately 10:39 a.m., surveillance observed Chaparro arrive in the gold Mazda in the area of the Mendez Residence.

92.  On or about November 30, 2012, at approximately 10:52 p.m. (Call #478), Chaparro, who was using Target Phone 12, had a telephone conversation with VALENCIA-PANTOJA, who was using Valencia Phone 1. During the conversation, Chaparro and VALENCIA-PANTOJA discussed conducting the narcotics transaction

48

at the Mendez Residence. Specifically, Chaparro said, "The same as last time he came here [VALENCIA-PANTOJA's narcotics courier, later identified as Lucio Cuevas,[26] should deliver the cocaine to the Mendez Residence]." VALENCIA-PANTOJA then said, "Okay, in about 20 minutes he is going over there [VALENCIA-PANTOJA's courier, later identified as Cuevas, would deliver the cocaine to the Mendez Residence in 20 minutes]."

93.     Approximately one hour later, at approximately 11:33 a.m., surveillance in the area of the Mendez Residence observed a green Hyundai (the "Courier Vehicle") traveling westbound on Grace Street, which is to the north of both the Chaparro Residence and the Mendez Residence. Then, at approximately 11:34 a.m., law enforcement conducted a traffic stop on the Courier Vehicle in the area of 7400 W. Waveland Avenue, which is to the south of the Mendez Residence and is approximately 2½ blocks from the Mendez Residence. At the time of the traffic stop, the Courier Vehicle was being driven by an individual later identified as Lucio Cuevas.[27] During the stop, a law enforcement officer observed in plain view two rectangular shaped objects in a gift bag located on the vehicle's passenger seat that, based upon the officer's training and experience, appeared to be two kilograms of narcotics.[28]

---

[26]     *See* footnote 27, below.

[27]     In connection with the traffic stop, the driver of the Courier Vehicle provided law enforcement with a Mexican identification card bearing the name "Lucio Cuevas" and a photograph of Cuevas.

[28]     The two suspected kilograms of narcotics recovered from the Courier Vehicle on or about November 30, 2012, were seized and subsequently submitted to the laboratory for testing, and the results showed that the packages contained approximately 1.987

94.    Immediately following the traffic stop, Cuevas was taken into custody and law enforcement assumed control of the Courier Vehicle and its contents, including the two kilograms of cocaine and a handgun later found in a trap compartment in the vehicle. Law enforcement then began driving the Courier Vehicle around the area of the Mendez Residence while determining whether to attempt a controlled delivery of the two kilograms of cocaine to Mendez and Chaparro at the Mendez Residence.

95.    On or about November 30, 2012, at approximately 11:41 a.m. (Call #482), Chaparro, who was using Target Phone 12, had a telephone conversation with Mendez, who was using Target Phone 7.[29] During the conversation, Chaparro told Mendez to open the door of the garage at the Mendez Residence so that the Courier Vehicle could

---

kilograms of cocaine

[29]    Mendez been identified as the user of Target Phone 7 based in part on the following information. On or about March 29, 2012, two Chicago Police Department (CPD) officers, including CPD Officer Dolan, conducted a traffic stop on a vehicle in which Mendez was riding, and during that stop, Mendez provided an Illinois identification card bearing his name. In addition, during the stop, the two CPD officers had a conversation with Mendez that lasted approximately ten to fifteen minutes. Then, on or about September 19, 2012, Chief Judge James Holderman authorized the interception of wire communications over Chaparro's cellular telephone bearing telephone number (773)425-3065 (Target Phone 6). Pursuant to that Order, interception over Target Phone 6 began on September 19, 2012, and ended on October 9, 2012. During that interception period, a number of phone calls were intercepted between Chaparro, who was using Target Phone 6, and telephone number 708-595-4176 (Target Phone 7), including Call #3530, Call #4066, Call#4067, Call#4070, and Call #4073. After listening to these calls, CPD Officer Dolan recognized the voice of the person using Target Phone 7 as that of Mendez. In addition, on or about September 28, 2012, at approximately 1:14 p.m. (Call #3530), Mendez, who was using Target Phone 7, had a telephone conversation with Chaparro, who was using Target Phone 6. During their conversation, Mendez informed Chaparro that the telephone number from which he was calling, Target Phone 7, was his new telephone number. More specifically, Chaparro said, "Hey, you know that phone? I think it's off." Mendez responded, "I know. [Individual B] turned it off. This [Target Phone 7] is the new one here." Chaparro then said, "Oh, okay, okay, cool."

enter. Specifically, Chaparro said, "Open the door in the back [open the door to the detached garage at the Mendez Residence]." Mendez responded, "Oh, okay."

96.     At approximately 11:41 a.m., law enforcement driving the Courier Vehicle in the area of the Mendez Residence observed Chaparro, driving the gold Mazda, following the Courier Vehicle. Shortly thereafter, law enforcement turned the Courier Vehicle southbound on Olcott, towards the Mendez Residence. As the law enforcement officer turned onto Olcott, he observed Chaparro drive into the mouth of the alley to the east of Olcott, at which point Chaparro stopped, honked his horn, and waived his hand, gesturing for the Courier Vehicle to enter the alley. Based upon these gestures, law enforcement believes that Chaparro was attempting to direct the Courier Vehicle toward the detached garage of the Mendez Residence. After Chaparro gestured toward the Courier Vehicle, law enforcement continued to drive southbound on Olcott, past the Mendez Residence, and then continued driving around the area of the Mendez Residence.

97.     On or about November 30, 2012, at approximately 11:41 a.m. (Call #483), Chaparro, who was using Target Phone 12, had a telephone conversation with VALENCIA-PANTOJA, who was using Valencia Phone 1. During the conversation, Chaparro and VALENCIA-PANTOJA discussed why the Courier Vehicle was not entering the garage. Specifically, Chaparro said, "Listen, you send someone who has never came here. He is going in circles here, and I am behind him blowing the horn, and he keeps going." VALENCIA-PANTOJA responded, "But it's Lucio [Cuevas driving the vehicle], no?" Chaparro responded, "No, it's the other stupid, the brother,

51

I think . . . but he has never came here. He is in front of me. I am blowing the horn and he does not stop." VALENCIA-PANTOJA responded, "Okay, give me a few."

98. Approximately two minutes later, at approximately 11:43 a.m., surveillance established in the area of the Mendez Residence observed Mendez standing in the entryway of the detached garage located at the Mendez Residence with the overhead garage door open. At approximately 11:50 a.m., surveillance observed a marked CPD vehicle driving in the area of the Mendez Residence, at which time surveillance also observed Mendez close the overhead garage door at the Mendez Residence.

99. On or about November 30, 2012, at approximately 11:46 a.m. (Call #487), Chaparro, who was using Target Phone 12, had a telephone conversation with VALENCIA-PANTOJA, who was using Valencia Phone 1. During the conversation, Chaparro said, "Look . . . he has never come over here." VALENCIA-PANTOJA responded, "I talked to his brother and he said . . . it is Lucio [VALENCIA-PANTOJOA believed that it was Lucio Cuevas, not CPD, that was driving the Courier Vehicle]." Chaparro then asked, "Then why does he keep going if he just came over here before?" VALENCIA-PANTOJA responded, "He always goes two or three times around the block before he arrives there." Later, Chaparro said, "He should have been here already. . . . I am standing here on the corner but this looks bad, someone standing looking like this."

100. On or about November 30, 2012, at approximately 11:50 a.m. (Call #488), Chaparro, who was using Target Phone 12, had a telephone conversation with

VALENCIA-PANTOJA, who was using Valencia Phone 1. During the conversation, the two men again tried to figure out who was driving the Courier Vehicle, which in fact was being driven by CPD officers. Specifically, Chaparro said, "I don't know what to tell you. All I know is that I am behind them and keep blowing the horn and he kept going. I am here parked and he does not arrive. I am in the car and I am going around." VALENCIA-PANTOJA then asked, "[W]hat could have happened?" Later, VALENCIA-PANTOJA said, "Don't know. I called him [Cuevas] two times and he does not answer."

101. As set forth above (*see* paragraph 94), after Cuevas was taken into custody, law enforcement assumed control of the Courier Vehicle and its contents, including the two kilograms of cocaine and a handgun later found in a trap compartment in the vehicle. Subsequent field testing of the suspected cocaine tested positive for the presence of cocaine. The suspected cocaine has been submitted to the laboratory for forensic analysis, and law enforcement is awaiting the results.

Conclusion

102. Based upon the above information, there is probable cause to believe that:

a. JOSE ARGUIJO did knowingly and intentionally distribute a controlled substance, namely 5 kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1);

b. ANTONIO VALENCIA-PANTOJA, did conspire with Lucio Cuevas, and with others known and unknown, to knowingly and intentionally possess with

53

intent to distribute and distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), in violation of Title 21, United States Code, Section 846;

      c.    ANTHONY MADISON did knowingly and intentionally possess with the intent to distribute a controlled substance, namely 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1);

      d.    PAUL JENKINS and LAKICHA WHITE did knowingly and intentionally possess with the intent to distribute a controlled substance, namely 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) and 2;

      e.    DILSON ROCHA did knowingly and intentionally possess with the intent to distribute a controlled substance, namely 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1);

      f.    JOEL MELENDEZ did knowingly and intentionally possess with the intent to distribute a controlled substance, namely 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1); and

g.     DWAYNE PAYNE did knowingly and intentionally possess with the intent to distribute a controlled substance, namely 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).


FURTHER AFFIANT SAYETH NOT.

ROBERT LUKENS
Special Agent, Drug Enforcement Administration


SUBSCRIBED AND SWORN to before me on February 13, 2012.

DANIEL G. MARTIN
United States Magistrate Judge

55